UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WILBUR E. GIFFORD, III, individually,
and on behalf of all those similarly
situated; PAUL VANN, individually,
and on behalf of all those similarly
situated: and TESS FULLER, individually,
and on behalf of all those similarly
situated; BERNICE SOLOMON,
EMORY SOLOMON. DEBBIE BOHNER,
SUSAN BOHNER, KENNETH BRIGHAM,
LASSIE CANTY HOLLOWAY, CARL HOLLOWAY,
JALYNA CANTY, VERONICA AGEE-KELLUM.
OLENZIA EVANS, BERNADETTE EVANS,
HELEN MADISON, LEROY CARNEGIE,

       Plaintiffs,              Case No.: 8.08-cv-00112-T-17-MSS

v.

CITY OF TAMPA, a municipal corporation:
PAMELA D. IORIO, WILLIAM DOHERTY,
CURTIS LANE, SAM SMITH, JORGE MARTIN,
NICK D'ANDREA, and W.D. RYAN,[1]

       Defendants.

_____/

## ORDER

    This case is before the Court on Defendants, Pamela Iorio, Jorge Martin, Nick D'Andrea, and Curtis Lane's, motions to dismiss Counts III and VI based on qualified immunity and a failure to state a cause of action, (Doc. Nos. 6. 9); Plaintiffs' responses, (Doc. Nos. 14, 19): and Plaintiffs' Amended Reply and Motion to Strike Defendant City of Tampa's Affirmative Defenses. (Doc. No. 25).

_____

[1] The Court notes that no service has been obtained as to the Defendants, William Doherty, Sam Smith, and W.D. Ryan.

The Plaintiffs' Amended Complaint contains the following Counts:

Count I: Gifford against the City of Tampa for inverse condemnation.

Count II: Residents against the City for inverse condemnation.

Count III: Gifford against Individual Defendants for Section 1983 violation.

Count IV: Gifford against the City of Tampa for Section 1983 violation.

Count V: Gifford against the City of Tampa for false arrest/false imprisonment.

Count VI: Residents against the Individual Defendants for Section 1983 violation.

Count VII: Residents against the City of Tampa for Section 1983 violation.

## Facts

The following facts are taken from the Amended Complaint in this cause and are accepted as true only for the purpose of resolving the pending motions.

Plaintiff, Wilbur E. Gifford, III ("Gifford"), was the owner the End Gate Mobile Home Park, (hereinafter "subject property"). (Doc. No. 2, ¶ 3). Members of the putative class action including Bernice Solomon, Emory Solomon, Debbie Bohner, Susan Bohner, Kenneth Brigham, Lassie Canty Holloway, Carl Holloway, Jalyna Canty, Veronica Agee-Kellum, Olenzia Evans, Bernadette Evans, Helen Madison, and Leroy Carnegie, ("the residents"), leased mobile homes from Gifford. (*Id.*, ¶ 21). Defendants, Pamela D. Iorio ("the Mayor"), Jorge Martin ("Martin"), Nick D'Andrea ("D'Andrea"), and Curtis Lane ("Lane"), were employees of the City of Tampa, acting in the course and scope of their employment with the City of Tampa ("Tampa"). (*Id.*, ¶¶ 4, 6, 8, 9). Tampa remains a municipal corporation organized and existing under the laws of the State of Florida. (*Id.*, ¶ 2).

Both Counts III and VI of the Plaintiffs' Amended Complaint allege civil rights violations of 42 U.S.C. Section 1983, specifically that the individual Defendants deprived the Plaintiffs of their due process rights and their right to be free from unreasonable seizure. Both counts contain the same factual allegations; the only difference is that Count III was brought by Gifford against the four individual Defendants and Count VI by the residents against the four individual Defendants.

On or about August 18, 2003, Gifford met with Tampa code enforcement officer Don Scott, on the subject property, about certain alleged violations of the City of Tampa Municipal Code ("the Code") such as overgrowth, inoperable vehicles, inadequate addresses on homes and structure, and other Code violations which constituted nuisances. (*Id.*, ¶ 12). During this meeting, Mr. Scott advised Gifford that he was making good progress with addressing code compliance concerns and to keep up the effort, which Gifford did. (*Id.*, ¶ 12). Mr. Scott and Gifford were both aware of an upcoming code enforcement hearing scheduled for August 20, 2003. (*Id.*, ¶ 13). Just before the hearing, Mr. Scott predicted that the Hearing Master would give Gifford sixty days to cure the violations. (*Id.*, ¶ 14). At the code enforcement hearing, the Hearing Master determined that Gifford had complied with three violations pertaining to "Deteriorated Structure," and gave him sixty days until around October 23, 2003, to cure other violations for "Accumulations" (unsightly items on the subject property), "Inoperative Vehicles," and "Public Nuisances," which Gifford addressed immediately. (*Id.*, ¶ 15). The subject property was improved with ninety-nine concrete mobile home pads, two separate buildings containing six apartments each, a recreation center, a restaurant, and nine cottages and duplexes. (*Id.*, ¶ 16).

Of the eighty-two mobile homes that were located on the subject property, Gifford owned sixty-three. (*Id.*, ¶ 17).   He also owned all the utility and septic systems underground. (*Id.*, ¶¶ 18, 19, 20).  Gifford leased the mobile homes to the residents. (*Id.*, ¶ 21). On September 7, 2003, the Mayor visited the subject property with Tampa Fire Department personnel. (*Id.*, ¶ 23).  The next morning, on September 8, 2003, Tampa code officials Susan Sexton and Mike Williams showed up at the subject property unannounced and advised Gifford that the Mayor had sent them out to inspect the subject property. (*Id.*, ¶ 24).   Ms. Sexton indicated that the only urgent situation pertained to trailer number 305, and sewer line serving Lots 214 and 216 and that the remaining repairs were minor. (*Id.*, ¶ 25).   That same day, Tampa's chief code enforcement officer, William Doherty, called Tampa's demolition contraction H.B. Walker, Inc. and requested that it prepare to begin demolition of the subject property by the next day, September 9, 2003. (*Id.*, ¶¶ 26, 27).

On September 9, 2003, Tampa code officials Susan Sexton and Mike Williams advised Gifford that he must make sufficient progress in performing the required work or else the Mayor would shut down the subject property. (*Id.*, ¶ 28). At no time during the year or two prior to September 8, 2003, did any of the citations or alleged Code violations state that they rose to the level of either (a) constituting a hazard to the safety, health or welfare of the occupants (residents) or to the general public because the homes or structure lacked maintenance, sanitary facilities or otherwise fail to comply with standards of the Code such that any home or structure on the subject property was unfit for human habitation; or (b) any of the homes or structure being so unsafe as to endanger life or limb in so imminent a manner as to require immediate action in

response to an emergency. (*Id.*, ¶ 30). During the year or two prior to September 8, 2003, Gifford was never informed that the subject property was in danger of being condemned and demolished. (*Id.*, ¶ 31).

On September 10, 2003, the Mayor visited the subject property again and expressed dissatisfaction with the fact that the code officials had not started moving people out and tearing down the homes. (*Id.*, ¶ 33). That same day, code enforcement officers posted placards on the improvements stating that the property was being condemned and that the homes were going to be demolished. (*Id.*, ¶ 34). The residents were forced to leave. (*Id.*, ¶ 34). As of September 10, 2003, the residents occupied the mobile homes. (*Id.*, ¶ 35). Around this time, the Tampa Electric Company ("TECO") turned off power service to the subject property, which in turn led to the water service being turned off as well. (*Id.*, ¶¶ 36, 37). On September 10, 2003, Tampa requested H.B. Walker, Inc. to begin demolition of the subject property. (*Id.*, ¶ 38). Tampa had port-o-lets delivered to the subject property and set up tables in anticipation of the demolition. (*Id.*, ¶ 39). However, the demolition could not begin as planned because a demolition permit had not been issued by Tampa. (*Id.*, ¶ 40). Tampa issued the demolition permit on September 11, 2003. (*Id.*, ¶ 41). Prior to demolition, Tampa officials notified the residents of the subject property that they had twenty-four hours to vacate or they would be subject to arrest. (*Id.*, ¶ 42). Tampa offered them $500.00 vouchers to relocate their mobile homes. (*Id.*, ¶ 42). Many, if not most, of the residents left their mobile homes without their personal belongings. (*Id.*, ¶ 42).

The City of Tampa directed H.B. Walker, Inc. to begin demolishing the lots and the structures on them. (*Id.*, ¶ 66). On September 11, 2003, Tampa code official Mike

Williams identified the first seven lots and the mobile homes on them to be demolished: A3, A4, 204, 206, 211, 212, and 213. (*Id.*, ¶ 67).  Mike Williams also requested that everything be removed including concrete slabs, utilities, vegetation under three inches and all mobile homes. (*Id.*, ¶ 68).  On the same day, inspection reports were prepared for lots 204, 206, 211, 212, 213, 220, 223, 224, 225, 226, 232, 310, 315, and 317. (*Id.*, ¶¶ 69, 70).  The inspection reports identified the violations and provided Gifford twenty-one days to correct them. (*Id.*, ¶ 71). But the same inspection reports stated that the properties were in an emergency condition and must be repaired within five days. (*Id.*, Exhibits B, C).  The next day, September 12, 2003, Tampa's chief code enforcement officer William Doherty advised Gifford that he was not permitted to repair anything on the subject property, that Tampa was taking the subject property, and that Gifford would be arrested if found on the subject property. (*Id.*, ¶ 72).

On September 12, 2003, the first seven lots - A3, A4, 204, 206, 211, 212, and 213 - and the mobile homes on them were demolished. (*Id.*, ¶ 73).  Personal belongings were still in the mobile homes at the time of the demolition. (*Id.*, ¶ 74).  Condemnation reports were prepared for the seven lots that were demolished on September 18, 2003. (*Id.*, ¶ 75).  On September 23 and 24, 2003, Tampa's condemnation review team – Sam Smith, Roland Gonzalez, Nick D'Andrea, and William Doherty – approved the condemnation for the seven demolished lots. (*Id.*, ¶ 76).  On September 24, 2003, Tampa issued an emergency order to demolish the seven lots. (*Id.*, ¶ 77). According to this emergency order, dated September 24, 2003, the lots were condemned as a nuisance pursuant to sections 9-5(5) and 19-7 of the Code and as defined in sections 19-48 and 19-49 of the Code. (*Id.*, ¶ 79, Exhibit F).  The emergency order was hand-

delivered to Gifford on September 28, 2003 and provided him with twenty-one days to appeal. (*Id.*, ¶¶ 77). However, the same order stated that because an emergency order was issued and the lots condemned as a nuisance, the City of Tampa was authorized pursuant to the Code to demolish the lots notwithstanding the twenty-one day opportunity to appeal. (*Id.*, Exhibit F). On September 29, 2003, Tampa authorized H.B. Walker, Inc. to proceed with the demolition of the seven lots and the structures on them. (*Id.*, ¶ 82). On October 1, 2003, Gifford filed a Notice of Appeal for the seven lots and mobile homes. (*Id.*, ¶ 80).

Around September 14, 2003, lots B, 130, 208, 210, 214, 216, 218, 219, 220, 223, 224, 225, 226, 228, 230, 232, 305, 307, 310, 310.5, 315, 317, 319, 321, 331, and 335 were demolished (*Id.*, ¶ 83). On September 16, 2003, condemnation reports were prepared for lots B, 130, 220, 223, 224, 225, 226, 230, 232, 305, 310, 315, and 317. (*Id.*, ¶ 84). Of those lots, only lots B, 130, and 230 were identified as a public nuisance. (*Id.*, ¶ 84). They were, however, all tagged as emergencies. (*Id.*, Exhibits B, C, I, M). On September 19, 2003, Tampa issued an emergency order to demolish lots B, 130, 220, 223, 224, 225, 226, 230, 232, 305, 310, 315, and 317. (*Id.*, ¶ 85). This emergency order also provided Gifford twenty-one days to appeal, but again, stated that because an emergency order was issued Tampa was authorized under the Code to demolish the lots notwithstanding the opportunity to appeal. (*Id.*, ¶ 86). On October 1, 2003, Gifford filed a second Notice of Appeal for the thirteen demolished lots and homes. (*Id.*, ¶ 87). On October 7, 2003, a Notification of Violation regarding the thirteen lots and a Notice of Public Hearing – scheduled for October 8, 2003 – was forwarded to Gifford. (*Id.*, ¶ 88).

On September 8 and 9, 2003, condemnation reports were issued for lots 210, 214, 216, 218, 307, 310.5, 319, 321, 331, and 335. (*Id.*, ¶ 89). Although none of the reports identify the lots as public nuisances, they are identified as emergencies. (*Id.*, ¶ 89). On September 10, 2003, emergency orders to demolish were prepared for lots 208, 210, 214, 216, 218, 219, 228, 310.5, 307, 319, 321, 331, and 335. (*Id.*, ¶¶ 90, 91). The substance of this emergency order is identical to the others. Gifford received the emergency order on September 11, 2003. (*Id.*, ¶ 93). On October 1, 2003, Gifford filed a third Notice of Appeal for the thirteen demolished lots. (*Id.*, ¶ 94). On October 7, 2003, a Notification of Violation regarding the thirteen lots and a Notice of Public Hearing – scheduled for October 8, 2003 – was delivered to Gifford. (*Id.*, ¶ 95). Gifford appeared at the public hearing on October 8, 2003, but because the lots had already been demolished, the hearing was moot. (*Id.*, ¶ 96).

During the demolition of the first seven lots and the mobile homes, the underground improvements including the underground electrical service lateral, the underground septic system, and the central well and underground piping were all destroyed. (*Id.*, ¶ 98). The demolition left the homes, structures, and equipment on the lots unusable. (*Id.*, ¶ 100). Representatives of Tampa cited several reasons for the demolition including: sewage in the streets; the homes lacked hurricane tie-downs; were unfit for human habitation; constituted a public nuisance; and were damaged, deteriorated, or defective to such an extent that the cost of restoration or repair would exceed 75% of the assessed value. (*Id.*, ¶ 101). Demolition continued until the subject property was entirely demolished. (*Id.*, ¶ 102).

The Plaintiffs contend that Tampa officials must comply with the Code for inspection of properties and structures, issuance of citations for violation of the Code, notice to the owner and/or occupier of said property or structure, enforcing violation or continued violation (after proper notice) of said Code, condemnation and demolition of property and structure. (*Id.*, ¶ 137). The Code requires notices to be provided to owners and residents of property that are non-compliant with the Code and an opportunity to remedy the non-compliance, regardless of whether the non-compliance constitutes an emergency situation or not. (*Id.*, ¶¶ 138, 139). The Plaintiffs allege that the Defendants failed to properly and timely notify the Plaintiffs and, therefore, deprived them of an opportunity to remedy the non-compliance or otherwise challenge the proposed condemnation and demolition. (*Id.*, ¶ 140). The Plaintiffs also allege that none of the homes were in an emergency condition that justified immediate condemnation and demolition pursuant to the Code, but to the extent that some homes were in an emergency situation, the Defendants failed to properly notify Gifford so that he could remedy the non-compliance. (*Id.*, ¶¶ 141, 142). The Plaintiffs conclude that the actions of the Defendants, individually, constituted a deprivation of the Plaintiffs' due process and an unreasonable seizure of real and personal property, violative of the Fourteenth and Fourth Amendments to the United States Constitution, respectively. (*Id.*, ¶ 143).

Plaintiffs further allege that as a direct and proximate result of the Defendant's individual acts, the Plaintiffs have been brought into public scandal, suffered great humiliation, mental suffering, damaged reputation, economic losses, and other intangible losses. (*Id.*, ¶ 190). Plaintiffs also allege that they suffered a loss of liberty and freedom, mental anguish, loss of earnings, and loss of capacity for the enjoyment of

life. (*Id.*, ¶ 191). Plaintiffs demand compensatory and punitive damages and costs incurred in bringing the instant action, reasonable attorney's fees, and any other relief this Court deems equitable and just.

### Procedural History

On December 20, 2007, Plaintiffs, Gifford and the residents, filed the Amended Class Action Complaint and Demand for Jury Trial in the Circuit Court of the Thirteenth Judicial Circuit, Hillsborough County, Florida against the Defendants, Pamela Iorio, William Doherty, Sam Smith, Curtis Lane, Jorge Martin, Nick D'Andrea, and W.D. Ryan. (Doc. No. 2). In Counts III and VI, the Plaintiffs brought Section 1983 claims alleging that the Defendants, in their individual capacities, deprived the Plaintiffs of their right to due process and to be free from unreasonable seizure, violative of the Fourth and Fourteenth amendments to the U.S. Constitution, respectively. (*Id.*). The case was then removed to the United States District Court, Middle District of Florida, Tampa Division. Thereafter, on January 28, 2003, Defendants, Iorio, Martin, and D'Andrea, filed a motion to dismiss based on qualified immunity and a failure to state a cause of action. (Doc. Nos. 6). Defendant Curtis Lane did the same on February 2, 2008. (Doc. No. 9). Defendants, Doherty, Smith, and Ryan are no longer employed with the City of Tampa. The Plaintiffs then responded to the Defendants. Iorio, Martin and D'Andrea's, motion to dismiss on February 14, 2008, and to Defendant Curtis Lane's on February 21, 2008. (Doc. Nos. 14, 19). On March 6, 2008, Defendant, City of Tampa, filed an amended answer and affirmative defenses to Counts I, II, IV, V, and VII or the Plaintiffs' Amended Complaint. (Doc. No. 24). On March 12, 2008, the Plaintiffs filed an amended reply and

motion to strike the City of Tampa's affirmative defenses. (Doc. No. 25). Lastly, City of Tampa filed a response to the Plaintiffs' motion to strike. (Doc. No. 27).

## Standards of Review

### I. Motion to Dismiss based on Qualified Immunity

The Eleventh Circuit imposes a heightened pleading standard for Section 1983 claims against public officials who may be able to assert a qualified immunity defense. *Compare, Gonzalez v. Reno.* 325 F.3d 1228. 1235 (11th Cir. 2003) ("In examining the factual allegations in the complaint, we must keep in mind the heightened pleading requirements for civil rights cases, especially those involving the defense of qualified immunity.") *with Swann v. Southern Health Partners. Inc..* 388 F.3d 834, 837 (11th Cir. 2004) (explaining that Supreme Court overturned "any heightened pleading requirements in section 1983 actions against entities that cannot raise qualified immunity as a defense," but noting that heightened pleading is still required in the *Eleventh Circuit where defendants may be able to set up a qualified immunity defense*). To meet the Eleventh Circuit's heightened standard, a complaint must allege "with some specificity" the facts supporting its claim. *GJR Invs. v. County of Escambia,* 132 F.3d 1359. 1367 (11th Cir. 1998) ("[T]his circuit . . . has tightened the application of Rule 8 with respect to Section 1983 cases in an effort to weed out nonmeritorious claims, requiring that a § 1983 plaintiff allege with some specificity the facts which make out its claim.").

However, even if a plaintiff states a cognizable Section 1983 claim against government officials. "[q]ualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To be even potentially eligible for qualified immunity, the official has the burden of establishing that he was acting 'within the scope of his discretionary authority.'" *O'Rourke v. Hayes*, 378 F.3d 1201, 1205 (11th Cir. 2004) (quoting *Harsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995)).

Once it is established that the defendants were acting within their discretionary authority, the burden shifts to the plaintiffs to prove that qualified immunity is not warranted. *Vinyard.* 311 F.3d at 1346. The Supreme Court has articulated a two-part test in the qualified immunity analysis. First, the court must determine whether the plaintiff's allegations establish a constitutional violation. *Hope v. Pelzer.* 536 U.S. 730, 736 (2002); *Saucier v. Katz.* 533 U.S. 194, 201 (2001) (stating that the court must evaluate the complaint to determine if, assuming the allegations are true, it pleads a cognizable violation of the Constitution). If this is answered yes, the court's next step is to determine whether the allegedly violated right was clearly established. *Saucier.* 533 U.S. at 201. "The dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Id.* at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (stating that "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established.")). In essence, a defendant is entitled to "fair warning" that his alleged conduct would be unconstitutional. *Hope*, 536 U.S. at 741.

Gifford and the residents must satisfy both prongs set out in *Saucier* to establish that the moving Defendants are not entitled to a qualified immunity defense.

## II. Motion to Strike Affirmative Defenses

Federal Rule of Civil Procedure 12(f) allows a court to strike from a pleading "any insufficient defense, or any redundant, immaterial, impertinent, or scandalous matter." *Harvey v. Home Depot, U.S.A., Inc.,* 2005 WL 1421170 *1 (M.D. Fla. 2005). "To the extent that a defense puts into issue relevant and substantial legal and factual questions, it is 'sufficient' and may survive a motion to strike, particularly when there is no showing of prejudice to the movant." *Reyher v. Trans World Airlines, Inc.,* 881 F. Supp. 574, 576 (M.D. Fla. 1995) (citing *Augustus v. Board of Public Instruction,* 306 F.2d 862, 868 (5th Cir. 1962)).

A "court will not exercise its discretion under the rule to strike a pleading unless the matter sought to be omitted has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party." *Reyher,* 881 F. Supp. at 576. In evaluating a motion to strike, "the court must treat all well pleaded facts as admitted and cannot consider matters beyond the pleadings." *LeMaster v. USAA Life Ins. Co.,* 1995 WL 708656, *1 (M.D. Fla. 1995).

An affirmative defense will be held insufficient as a matter of law only if it appears that the defendant cannot succeed under any set of facts which it could prove. *Reyher,* 881 F. Supp. at 576 (citing *Equal Employment Opportunity Comm'n v. First Nat'l Bank,* 614 F.2d 1004, 1008 (5th Cir. 1980)). Moreover, striking a defense is a "'drastic remedy [,]' which is disfavored by the courts." *Thompson v. Kindred Nursing Centers East, LLC,* 211 F. Supp.2d 1345, 1348 (M.D. Fla. 2002).

Discussion

I.   Motion to Dismiss Based on Qualified Immunity

In order to prevail on a Section 1983 claim against public officials who may be able to assert a qualified immunity defense, the Plaintiffs must meet a heightened pleading standard. The Plaintiffs must allege "with some specificity" the facts supporting their claim. *GJR Invs.*, 132 F.3d at 1367. The purpose with the heightened pleading standard is to weed out nonmeritorious claims. *Id.* The Amended Complaint and the exhibits fail to provide the factual specificity required to establish the Plaintiffs' conclusory allegations against each moving Defendant.

For instance, this is all we know about each Defendant: First, the Mayor. On September 7, 2003, the Mayor visited the subject property with Tampa Fire Department personnel. (Doc. No. 2, ¶ 23). The next morning, September 8, 2003, Tampa code officials Susan Sexton and Mike Williams visited the subject property and told Gifford that the Mayor had sent them to inspect the subject property. (*Id.*, ¶ 24). The day after that, on September 9, 2003, the same Tampa code officials advised Gifford that unless he made sufficient progress on the required work, the Mayor would shut down the subject property. (*Id.*, ¶ 28). On September 10, 2003, the Mayor once again visited the subject property and expressed dissatisfaction that code enforcement had not started to move people out and tear down the homes. (*Id.*, ¶ 33).

Defendant Martin, as the assistant city attorney, signed off on three emergency orders to demolish issued by the City of Tampa pursuant to the Code. (*Id.*, Exhibits F, J, N). These emergency orders constituted the lots as nuisances pursuant to the Code

14

and authorized Tampa to immediately abate the nuisance notwithstanding the twenty-one day opportunity to appeal.

Defendant D'Andrea, a member of Tampa's Condemnation Team signed off on a condemnation site review, dated September 22, 2003, for several lots that were eventually demolished. (*Id.*, Exhibit E).

Lastly, Defendant Lane is not mentioned by name in any of the factual allegations in the Plaintiff's Amended Complaint or in any of the exhibits attached thereto.

The Plaintiffs then conclude that each Defendant failed to comply with the Code, which required the Defendants to give the Plaintiffs proper notice and an opportunity to remedy the Code violations. (*Id.*, ¶ 140). The Plaintiffs also conclude that by failing to comply with the Code, the Defendants violated the Plaintiffs' constitutional rights. (*Id.*, ¶ 143).

The Court is left with bare conclusions and many questions unanswered. As Tampa employees, what responsibilities did each Defendant have? What statutory authority did they have? How did each Defendant's actions lead to the deprivation of the Plaintiffs' due process? How did each Defendant's actions lead to an unreasonable seizure of the Plaintiffs' property? The Court cannot ascertain from the Amended Complaint or from the exhibits the factual predicate necessary to establish the allegations against the Defendants in their individual capacities. Plaintiffs have asserted only bare conclusions that are insufficient to satisfy the heightened standard. *See Dukes v. Miami-Dade County*, 232 Fed. Appx. 907, 912 (11th Cir. 2007). Therefore, the Plaintiffs have failed to meet the heightened pleading standard.

But even assuming that the Plaintiffs met the heightened pleading standard, they would have failed to overcome the qualified immunity defense. At the start of a qualified immunity analysis, the Defendants must establish that they were acting within the scope of their discretionary authority as government employees of the City of Tampa. *O'Rourke*, 378 F.3d at 1205. It is undisputed and, therefore, established that all four Defendants acted within the scope of their discretionary authority as employees of Tampa. (Id., ¶¶ 4, 6, 8, 9). Therefore, the burden shifts to the Plaintiffs to prove that qualified immunity is not warranted. *Vinyard*, 311 F.3d at 1346.

Next, the court must determine whether the Plaintiffs' allegations establish a constitutional violation. *Hope*, 536 U.S. at 736. If this is answered yes, the Court then determines whether the right in question was clearly established. *Saucier*, 533 U.S. at 201.

The Plaintiffs here assert Section 1983 claims against the four Defendants, individually, for deprivation of due process and violation of their right to be free from unreasonable seizure. The Court will address the due process claim first.

There is no doubt that the Due Process Clause requires notice and the opportunity to be heard prior to the deprivation of life, liberty or property at the hands of the government. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950). It is also clear that the government must provide the requisite notice and opportunity for a hearing "at a meaningful time and in a meaningful manner," although in "extraordinary situations" the provision of notice and a hearing may be postponed until after the deprivation has occurred. *Fuentes v. Shevin*, 407 U.S. 67, 80, 90 (1972). If the government violates the Due Process Clause, the aggrieved party can seek

compensatory damages and equitable relief under Section 1983. *McKinney v. Pate*, 20 F.3d 1550, 1555, 1557 (11th Cir. 1994) (en banc).

A Section 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a property interest protected by the Constitution; (2) state action; and (3) a constitutionally-inadequate process. *Cryder v. Oxendine*, 24 F.3d 175, 177 (11th Cir. 1994). In this case, the first two elements are not in dispute. Gifford was the owner of the subject property and the residents leased the mobile homes from Gifford. Clearly, Gifford and the residents enjoyed a constitutionally-protected property interest in the subject property. *See Greene v. Lindsey*, 456 U.S. 444, 450-51 (1982) (concluding that continued residency in leasehold property is a "significant interest in property" subject to due process protection). It is also undisputed that each Defendant's conduct, as employees of the City of Tampa at the time, constituted "state action" for the purposes of Section 1983. However, the factual allegations in the Plaintiffs' Amended Complaint as to each Defendant fail to establish *how* each Defendant's conduct led to the deprivation of the Plaintiffs' due process. Given the dearth of facts, the Court cannot determine whether the Defendants' "state action," individually, constituted a deprivation of due process.

For instance, paragraphs 137 and 138 of the Amended Complaint state that the Code requires notices to be provided to residents regardless of whether their property is in an emergency condition. What the Amended Complaint fails to state, however, is *who* was required to provide the notices and *how*?

Further, it is uncertain whether the notice that was provided to the Plaintiffs was improper and untimely, as alleged in the Amended Complaint. Paragraph 34 states that

on September 10, 2003, two days before demolition, Tampa code officials posted placards notifying the residents that the property was being condemned and demolished. Moreover, paragraph 42 states that prior to demolition, Tampa officials notified residents of the property that they had twenty-four hours to vacate and offered them $500.00 vouchers to relocate. The exact date of this second notice is unspecified; however, it is established that notice was provided at least two days prior to demolition.

In addition to their Section 1983 due process claim, the Plaintiffs brought a second Section 1983 action claiming that the Defendants' individual actions constituted an unreasonable seizure, violative of the Fourth Amendment. The Fourth Amendment of the U.S. Constitution provides, in pertinent part, that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. Thus, to establish a Fourth Amendment violation, the Plaintiffs must prove that there was in fact a seizure of their property, and the seizure was unreasonable.

A seizure occurs when there is some meaningful interference with an individual's possessory interest in property. *Soldal v. Cook County, Ill.*, 506 U.S. 56, 60 (1992). Here, approximately thirty-three lots and the structures and mobile homes on them were demolished. Further, many residents of the demolished mobile homes were not able to retrieve their personal belongings prior to demolition. Thus, it is clear that a Fourth Amendment seizure occurred. *See Debari v. Town of Middleton*, 9 F. Supp.2d 156, 161 (N.D.N.Y. 1998) ("Where, as here, the government demolishes a building, a 'seizure' results within the meaning of the Fourth Amendment."). However, it is impossible to ascertain whether any of the individual Defendants' actions led to the seizure. Instead, it

appears from the factual details in the Amended Complaint that persons or entities other than the named Defendants were responsible for the seizures.

For instance, according to paragraphs 38 through 41, the City of Tampa, not any of the moving Defendants, requested H.B. Walker, Inc. to begin demolition, had port-o-lets delivered to the subject property in anticipation of demolition, and issued H.B. Walker, Inc. a demolition permit. Paragraph 66 states again that Tampa directed H.B. Walker, Inc. to begin demolition. Then, paragraphs 67 and 68 allege that on September 11, 2003, Tampa code official Mike Williams, not any of the Defendants, identified the first seven lots to be demolished and directed everything be removed including concrete slabs, utilities, vegetation under three inches and all mobile homes. Mike Williams is not a Defendant in this case.

Moreover, according to Exhibit H, Tampa's chief code enforcement officer William Doherty, not any of the moving Defendants, signed the work order directing H.B. Walker, Inc. to proceed with the demolition of the first seven lots and the three emergency orders to demolish the rest. William Doherty no longer is employed by the City of Tampa.

Even if we could identify the person or entity responsible for the seizure, we are not certain the seizure was unreasonable. The Fourth Amendment "reasonableness" standard carefully balances governmental versus private interests. *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000). Moreover, a determination of reasonableness involves looking at the complete context of the seizure. *Tribue v. Hough*, 2006 WL 42163 (N.D. Fla. 2006). In the nuisance abatement context, the governmental

justification for seizing the property is to protect the health and welfare of its citizens from a public nuisance. *Id.* at 6.

The inspection reports and the condemnation reports attached to the Plaintiffs' Amended Complaint gives context. Every inspection report and condemnation report indicated that the particular lot and structure on it was in an emergency condition. The inspection reports in Exhibits B and C described the inspected properties as "unfit for human habitation," and "no electric. water or sanitary facilities."

Similarly, every condemnation report in Exhibits D, I, and M tagged the properties as being in an emergency condition and reported deterioration rates ranging from 50 to 100%. These reports described the properties as having "unsound framing, flooring and foundation . . . and unsafe conditions," and "open electrical wiring . . . stench of mold, mildew throughout trailer, very unsanitary." The reports also indicated that the mobile homes had been vandalized and there were children in the neighborhood.

Moreover, the emergency orders in Exhibits F, J, and N issued for the demolished lots constituted the lots as a nuisance as defined in section 19-48 and 19-49 of the Code. Lastly, the Affidavit of Violation in Exhibit L described 13 mobile homes has having "hazardous exposed wiring." Given this context, it appears that the condemnation and demolition of the lots and the mobile homes were not unreasonable.

The factual allegations in the Amended Complaint and the exhibits are inadequate to support the conclusion that each individual moving Defendant's actions constituted a violation of due process and an unreasonable seizure.

## II. Motion to Strike Affirmative Defenses

The Plaintiffs, Gifford and the residents, move to strike Defendant Tampa's affirmative defenses. To prevail, the Plaintiffs must demonstrate that "the matter[s] sought to be omitted has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party." *Reyher v. Trans World Airlines, Inc.*, 881 F. Supp. 574, 576 (M.D. Fla. 1995). "To the extent that a defense puts into issue relevant and substantial legal and factual questions, it is 'sufficient' and may survive a motion to strike, particularly when there is no showing of prejudice to the movant." *Id.*

Defendant Tampa filed an Amended Answer and Affirmative Defenses to Counts I, II, IV, V, and VII. (Doc. No. 24). The Plaintiffs then filed an Amended Reply and Motion to Strike the affirmative defenses in which the Plaintiffs argued, without more, that each affirmative defense was "merely a conclusory statement without an assertion of any grounds supporting its defense." (Doc. No. 25). Although this may have been true, Defendant Tampa subsequently filed a response to the motion to strike in which it "put[] into issue relevant and substantial legal and factual questions." (Doc. No. 27), *Reyher*, 881 F. Supp. At 576.

For instance, Defendant's first affirmative defense as to Count V asserts sovereign immunity under Section 768.28, Fla. Stat., a question of law to which the Defendant may be able to answer by establishing sufficient facts. Defendant's second affirmative defense of statute of limitations and doctrine of laches as to all Counts relies on the certain dates in the Amended Complaint that may bar this action under the statute of limitation. Defendant's third and fourth affirmative defenses as to Counts I and II, respectively, deny that Tampa's actions amounted to a takings – a legal premise

necessary to establish an inverse condemnation claim. Defendant's fifth and seventh affirmative defenses as to Counts IV and VII, respectively, contend that a municipality is not automatically vicariously liable under the doctrine of respondeat superior if some individual employee of Tampa is held liable for the Section 1983 violation. Lastly, Defendant's sixth affirmative defense as to Count V asserts that a claim of false arrest and imprisonment depends upon whether there was probable cause. The question of probable cause is a viable affirmative defense to be proven by the Defendant. *City of St. Petersburg v. Austrino*, 898 So.2d 955, 957 (Fla. 2nd DCA 2005).

The Defendant's affirmative defenses all have a possible relationship to the controversy and do not confuse the issues. The Plaintiffs have not alleged that they will be prejudiced by the denial of the motion to strike. Moreover, the affirmative defenses present relevant and substantial legal and factual questions sufficient to survive a motion to strike. *Reyher*, 881 F. Supp. at 576. Thus, the pleadings do not support the Plaintiffs' motion to strike the Defendant's affirmative defenses.

## Conclusion

The Plaintiffs' allegations, even if accepted as true, do not state a claim against the individual Defendants, Iorio, Martin, D'Andrea, and Lane, for violation of any rights secured to the Plaintiffs under the U.S. Constitution and, therefore, fail to meet the heightened pleading standard applied in the Eleventh Circuit. But even if the Plaintiffs met the heightened pleading standard, they would not have overcome the qualified immunity defense. The Plaintiffs' facts failed to show how each Defendant – the Mayor, Martin, D'Andrea, and Lane – deprived the Plaintiffs their due process and unreasonably seized their property.

As to the motion to strike Defendant's affirmative defenses, the Plaintiffs failed to demonstrate "the matter[s] sought to be omitted has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party." *Reyher*, 881 F. Supp. at 576. Moreover, the Defendants, in their response to the motion to strike, presented relevant and substantial legal and factual questions sufficient to overcome the motion.

Accordingly it is:

**ORDERED** that Defendants, Iorio ("the Mayor"), Martin, D'Andrea, and Lane's, motion to dismiss based on qualified immunity (Doc. Nos. 6, 9) be **GRANTED** with prejudice. Plaintiffs, Gifford and the residents', motion to strike Defendant, City of Tampa's, affirmative defenses (Doc. No. 25) is **DENIED**; and the Plaintiffs have ten days from this date to show cause why Defendants Sam Smith, William Doherty and W.D. Ryan, should not be dismissed from this action for failure to timely serve.

**DONE and ORDERED** in Chambers, in Tampa, Florida, this *16th* day of June, 2008.



ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

cc: All Parties and Counsel of Record